ROBBINS LLP
BRIAN J. ROBBINS (190264)
GEORGE C. AGUILAR (126535)
CRAIG W. SMITH (164886)
STEVEN R. WEDEKING (235759)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
gaguilar@robbinsllp.com
csmith@robbinsllp.com
swedeking@robbinsllp.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIFFANY BARNEY, Derivatively on Behalf of ACADIA PHARMACEUTICALS INC.,<br><br>             Plaintiff,<br><br>             v.<br><br>STEPHEN R. DAVIS, SRDJAN R. STANKOVIC, MICHAEL J. YANG, STEPHEN R. BIGGAR, LAURA A. BREGE, JULIAN C. BAKER, DANIEL B. SOLAND, EDMUND P. HARRIGAN, JAMES DALY, TODD S. YOUNG, and TERRENCE O. MOORE,<br><br>             Defendants,<br><br>             -and-<br><br>ACADIA PHARMACEUTICALS INC., a Delaware Corporation,<br><br>             Nominal Defendant. | Case No. **'20CV0238 BAS JLB**<br><br>[REDACTED] VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT<br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, documents produced in response to plaintiff's stockholder inspection demand, a review of public filings with the U.S. Securities and Exchange Commission ("SEC"), and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant ACADIA Pharmaceuticals Inc. ("ACADIA" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in billions of dollars in damages to ACADIA's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed ACADIA to billions of dollars in potential liability for violations of state and federal law.

2.     ACADIA is a pharmaceutical development company.  In April 2016, the U.S. Food and Drug Administration (the "FDA") approved the Company's first, and currently only drug, NUPLAZID® (also known as pimavanserin), for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis ("PDP").  ACADIA began selling the drug the next month.

3.     The path to FDA's approval of NUPLAZID was not smooth.  In its first three trials, NUPLAZID failed to show statistically significant improvements in patients with PDP.  Finally, on its fourth trial, NUPLAZID showed the requisite results, and ACADIA submitted a New Drug Application ("NDA") to the FDA.  The FDA's Advisory Committee begrudgingly voted to approve NUPLAZID, noting the "unmet medical need" for individuals with PDP.  The members of the Advisory Committee stated that they were concerned about the safety of NUPLAZID, the drug's efficacy, and some even stated that if there was a safe and effective alternative on the market, they would not have voted for

1    approval.

2        4.    The FDA accepted the Advisory Committee's recommendation and approved

3    NUPLAZID for sale in the United States.  However, the FDA required a "black box"

4    warning label on NUPLAZID, stating that there was an increased risk of death in elderly

5    patients with dementia-related psychosis treated with antipsychotic drugs.

6        5.



13       6.

24       7.

26   _____

27   [1] All references to "ACADIA_220_[number]" are from ACADIA's books and records
28   production in response to plaintiff's stockholder inspection demand.



8.

[2] Plaintiff's information about the amount of prescribers is limited by the inherently nonpublic information concerning drug prescriptions.  The amount of money spent on patients' claims' for NUPLAZID that were reimbursed under Medicare Part D is public. However, if a patient was not reimbursed under Medicare, then the sale of NUPLAZID (or the prescribing HCP) would not be public.

9. ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████

10. ███████████████████████████████████████████
█████████████████████████████████   ███████████████████
█████████████████████████████████ In particular, the Company's actions violate federal laws that prevent pharmaceutical companies from providing any exchange of remuneration to induce or provide referrals for drugs payable by a federal program.

11. ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████ ████ ████ █████ █████ ████ █ ████ ██████ ████ ████
███████████████████

12. As a result of the above illegal actions driving the Company's business, ACADIA made a series of improper statements that failed to disclose a significant source of the Company's sales. In addition, the members of the Board sought reelection to the Board and approval of incentive compensation plans via misleading proxy statements, also

in violation of federal law.

13.    When the public learned some of the truth about the Company's illegal business practices, ACADIA's stock price fell dramatically.  After Southern Investigative Reporting Foundation ("SIRF") published a report questioning some of the Company's practices on July 9, 2018,  ACADIA's stock price fell to just $16.63 per share, barely 40%, of the high the Company's stock price reached on June 8, 2016 of $41.55 per share, a drop of more than $2.6 billion.

14.    Further, as a direct result of this unlawful course of conduct, ACADIA is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Southern District of California on behalf of investors who purchased ACADIA's shares.

## JURISDICTION AND VENUE

15.    Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

16.    This court has jurisdiction over each defendant named herein because each defendant conducts business in this District, or is an individual with sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

17.    Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to ACADIA, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

# THE PARTIES

**Plaintiff**

18.     Plaintiff Tiffany Barney has continuously been a stockholder of ACADIA since 2012.

**Nominal Defendant**

19.     Nominal defendant ACADIA is a Delaware corporation with principal executive offices located at 3611 Valley Centre Drive, Suite 300, San Diego, California. ACADIA is a biopharmaceutical company focused on the development and commercialization of medicines that address unmet medical needs in central nervous system disorders.   As of September 30, 2019, the Company had approximately 490 employees.

**Defendants**

20.     Defendant Stephen R. Davis ("Davis") is ACADIA's Chief Executive Officer and a director and has been since September 2015.  Defendant Davis was also ACADIA's President from September 2015 to November 2018; Principal Financial Officer from November 2018 to March 2019 and from September 2015 to August 2016; Principal Accounting Officer from September 2015 to August 2016; Interim Chief Executive Officer from March 2015 to August 2015; and Executive Vice President, Chief Financial Officer and Chief Business Officer from July 2014 to August 2015.  Defendant Davis is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Davis knew about, allowed, or approved the ███████████████████████  He is also responsible for the negligently made material misstatements contained in the Company's proxy statements detailed herein. Defendant Davis knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, public filings, and/or analyst conference calls. ACADIA paid defendant Davis the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2018 | $719,833 | - | $505,400 | $4,771,631 | $493,806 | $17,362 | $6,508,032 |
| 2017 | $700,000 | - | - | $13,905,418 | $535,938 | $16,790 | $15,158,146 |
| 2016 | $675,992 | $437,705 | - | $8,133,720 | - | $14,030 | $9,261,447 |

21.     Defendant Srdjan R. Stankovic ("Stankovic") is ACADIA's President and has been since November 2018.  Defendant Stankovic was also ACADIA's Executive Vice President, Head of Research and Development from November 2015 to November 2018. Defendant Stankovic is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Stankovic knew about, allowed, or approved the ████████████████████████ Defendant Stankovic knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, public filings, and/or analyst conference calls.  ACADIA paid defendant Stankovic the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2018 | $524,785 | - | $705,700 | $4,094,313 | $334,289 | $19,254 | $5,678,341 |
| 2017 | $489,844 | - | - | $6,420,193 | $267,883 | $18,549 | $7,196,469 |
| 2016 | $475,000 | $219,688 | - | $2,033,430 | - | $15,100 | $2,743,218 |

22.     Defendant Michael J. Yang ("Yang") is ACADIA's Executive Vice President, Chief Commercial Officer and has been since March 2017.  Defendant Yang is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Yang knew about, allowed, or approved the ████████████████████ Defendant Yang knowingly or recklessly made improper statements in the Company's press releases, public filings, and/or analyst conference calls.  ACADIA paid defendant Yang the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2018 | $485,250 | $212,800 | $2,077,607 | $237,773 | $169,480 | $3,182,910 |
| 2017 | $361,731 | - | $11,460,367 | $197,822 | $84,028 | $12,103,948 |

23.   Defendant Stephen R. Biggar ("Biggar") is ACADIA's Chairman of the Board and has been since June 2016, and a director and has been since January 2013.  Defendant Biggar knew about, allowed, or approved the ████████████████████  He is also responsible for the negligently made material misstatements contained in the Company's proxy statements detailed herein.  Defendant Biggar knowingly or recklessly made improper statements in the Company's press releases and public filings.  ACADIA paid defendant Biggar the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|-------------|------------------------------|--------------|-------|
| 2018 | $105,000 | $171,284 | $276,284 |
| 2017 | $105,000 | $247,326 | $352,326 |
| 2016 | $80,000 | $362,194 | $442,194 |

24.   Defendant Laura A. Brege ("Brege") is an ACADIA director and has been since May 2008.  Defendant Brege is the Chair of ACADIA's Audit Committee and has been since at least April 2017, and a member of that committee and has been since at least April 2016.  Defendant Brege knew about, allowed, or approved the ████████████ ████████████  She is also responsible for the negligently made material misstatements contained in the Company's proxy statements detailed herein.  Defendant Brege knowingly or recklessly made improper statements in the Company's press releases and public filings.  ACADIA paid defendant Brege the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|------------------------------|--------------|------------------------|-------|
| 2018 | $75,000 | $171,284 | $547,345 | $793,629 |
| 2017 | $75,000 | $247,326 | $7,352 | $329,678 |
| 2016 | $58,000 | $323,388 | - | $381,388 |

- 8 -

25.     Defendant Julian C. Baker ("Baker") is an ACADIA director and has been since March 2015.  Defendant Baker knew about, allowed, or approved the ████████ ████████████████████ He is also responsible for the negligently made material misstatements contained in the Company's proxy statements detailed herein.  Defendant Baker knowingly or recklessly made improper statements in the Company's press releases and public filings.  ACADIA paid defendant Baker the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2018 | $60,000 | $171,284 | $231,284 |
| 2017 | $60,000 | $247,326 | $307,326 |
| 2016 | $59,500 | $323,388 | $382,888 |

26.     Defendant Daniel B. Soland ("Soland") is an ACADIA director and has been since March 2015.  Defendant Soland is a member of ACADIA's Audit Committee and has been since at least April 2017.  Defendant Soland knew about, allowed, or approved the ████████████████████████ He is also responsible for the negligently made material misstatements contained in the Company's proxy statements detailed herein. Defendant Soland knowingly or recklessly made improper statements in the Company's press releases and public filings.  ACADIA paid defendant Soland the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $70,000 | $342,567 | - | $412,567 |
| 2017 | $70,000 | $505,149 | $47 | $575,196 |
| 2016 | $58,750 | $323,388 | - | $382,138 |

27.     Defendant Edmund P. Harrigan ("Harrigan") is an ACADIA director and has been since November 2015.  Defendant Harrigan knew about, allowed, or approved the ████████████████████████ He is also responsible for the negligently made material misstatements contained in the Company's proxy statements detailed herein. Defendant Harrigan knowingly or recklessly made improper statements in the Company's

press releases and public filings.  ACACIA paid defendant Harrigan the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $50,000 | $342,567 | $1,985 | $394,552 |
| 2017 | $50,000 | $505,149 | $1,297 | $556,446 |
| 2016 | $60,000 | $323,388 | $65,693 | $449,081 |

28.   Defendant James Daly ("Daly") is an ACACIA director and has been since January 2016.  Defendant Daly is a member of ACACIA's Audit Committee and has been since at least April 2017.  Defendant Daly knew about, allowed, or approved the ███ ████████████████████████ He is also responsible for the negligently made material misstatements contained in the Company's proxy statements detailed herein.  Defendant Daly knowingly or recklessly made improper statements in the Company's press releases and public filings.  ACACIA paid defendant Daly the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $70,000 | $342,567 | $982 | $413,549 |
| 2017 | $70,000 | $505,149 | $997 | $576,146 |
| 2016 | $59,750 | $604,492 | - | $664,242 |

29.   Defendant Todd S. Young ("Young") was ACACIA's Executive Vice President and Chief Financial Officer from August 2016 to October 2018.  Defendant Young is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Young knew about, allowed, or approved the ████████████████████████ Defendant Young knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, public filings, and/or analyst conference calls.  ACACIA paid defendant Young the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2018 | $350,568 | - | $99,761 | $973,878 | - | $61,887 | $1,486,094 |
| 2017 | $409,542 | - | - | $2,675,273 | $201,572 | $15,232 | $3,301,619 |
| 2016 | $147,462 | $61,381 | - | $4,287,440 | - | $200,260 | $4,696,543 |

30.     Defendant Terrence O. Moore ("Moore") was ACADIA's Executive Vice President and Chief Commercial Officer from August 2013 to March 2017.  Defendant Moore is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Moore knew about, allowed, or approved the ████████████████████  Defendant Moore knowingly or recklessly made improper statements in the Company's press releases, public filings, and/or analyst conference calls.  ACADIA paid defendant Moore the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|------|--------|-------|---------------|------------------------|-------|
| 2016 | $421,200 | $175,325 | $2,033,430 | $14,030 | $2,643,985 |

31.     The defendants identified in ¶¶20-22, 29-30 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶20, 23-28 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶24, 26, 28 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶20-30 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

32.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe ACADIA and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ACADIA in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of ACADIA and not in furtherance of their personal interest or benefit.

- 11 -

33.     To discharge their duties, the officers and directors of ACADIA were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of ACADIA were required to, among other things:

(a)     ensure that the Company was selling and marketing its core product (indeed its only product) in an ethical and legal manner;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c)     remain informed as to how ACADIA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

34.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of ACADIA, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

35.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in violations of the federal False Claims Act ("FCA"), 31 U.S.C. §3729, make improper statements, conduct improper practices that wasted the Company's assets, and caused ACADIA to incur substantial damage.

36.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of ACADIA, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants

also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, ACADIA has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

37.    In addition to these duties, under the Audit Committee Charter, the Audit Committee Defendants, defendants Berge, Soland, and Daly, are charged with acting "on behalf of the Company's Board in fulfilling the Board's oversight responsibilities with respect to: (i) the Company's corporate accounting, financial reporting processes, systems of internal accounting and financial controls…; (ii) the quality and integrity of the Company's financial statements and reports…."  Moreover the Audit Committee's Charter provides that the Audit Committee's "key responsibilities" shall include:

### B. Oversee Internal Controls and Risk Management

*1. Complaint Procedures.* Establish procedures, when and as required by applicable laws, rules and regulations, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters. Review such procedures as necessary from time to time.

*2. Internal Control Over Financial Reporting.* Discuss with management and the Auditors the scope, adequacy and effectiveness of the Company's internal control over financial reporting.

*3. Financial Risk Assessment and Management.* Review and discuss with management the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures, including reviewing and/or implementing any guidelines and policies with respect to financial risk assessment and management adopted by the Company.

### C. Oversee Financial Reporting

*1. Accounting Principles and Policies.* Review and discuss with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement

presentation, including critical accounting policies and practices; alternative accounting policies available under GAAP that the Auditors have discussed with management, the ramifications of the use of such alternatives and the treatment preferred by the Auditors; the potential impact on the financial statements of regulatory and accounting initiatives; and any other significant reporting issues and judgments.

\*   \*   \*

**3. *Management's Discussion and Analysis*.** Review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the Securities and Exchange Commission (the ***"SEC"***).

**4. *Audited Financial Statements*.** Upon completion of the annual audit, (i) review the Company's annual financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and (ii) recommend whether or not such financial statements should be so included.

**5. *Quarterly Results*.** Prior to public disclosure of quarterly financial information, review and discuss with management and the Auditors the results of the Auditors' review of the Company's quarterly financial statements proposed to be included in the Company's Quarterly Report on Form 10-Q to be filed with the SEC, or included in the Company's quarterly earnings release, and any other matters required to be communicated to the Committee by the Auditors under the standards of the Public Company Accounting Oversight Board (United States).

**6. *Press Releases*.** Review and discuss with management and the Auditors, as appropriate, earnings press releases, as well as financial information and earnings guidance, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The chairperson of the Committee may represent the entire Committee for purposes of this discussion.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.

- 14 -

In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of ACADIA, regarding the Individual Defendants' management of ACADIA's operations; (ii) provide money and perks to HCPs to induce them to prescribe NUPLAZID; and (iii) enhance the Individual Defendants' executive and directorial positions at ACADIA and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

40.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

41.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

42.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist

the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## THE COMPANY'S CODE OF BUSINESS CONDUCT AND ETHICS

44.    The Company has adopted a Code of Business Conduct and Ethics (the "Code") that applies to all directors and employees.   The Code claims that "[t]he compliance environment within each supervisor's assigned area of responsibility will be a significant factor in evaluating the quality of that individual's performance."  In addition, the Code states, in relevant part:

> Violations of this Code will not be tolerated. Any employee who violates the standards in this Code may be subject to disciplinary action, which, depending on the nature of the violation and the history of the employee, may range from a warning or reprimand up to and including termination of employment and, in appropriate cases, civil legal action or referral for regulatory or criminal prosecution.

>                        *    *    *

> **2. Legal Compliance**

> Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail in Section 3 below). While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Chief Compliance Officer (as provided in Section 16).

Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including e-mails, are subject to internal and external audits, and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

\*     \*     \*

## 11. Gifts and Entertainment

Business gifts and entertainment are meant to create goodwill and sound working relationships and not to gain improper advantage with customers or facilitate approvals from government officials. The exchange, as a normal business courtesy, of meals or entertainment (such as tickets to a game or the theatre or a round of golf) is a common and acceptable practice as long as it is not extravagant, except as noted below. Unless express permission is received from a supervisor, the Chief Compliance Officer or the Nominating and Corporate Governance Committee of the Board of Directors, gifts and entertainment cannot be offered, provided or accepted by any employee unless consistent with customary business practices and not (i) of more than token or nominal monetary value, (ii) in cash, (iii) susceptible of being construed as a bribe or kickback, (iv) made or received on a regular or frequent basis or (v) in violation of any laws. This principle applies to our transactions everywhere in the world, even where the practice is widely considered "a way of doing business." Employees should not accept gifts or entertainment that may reasonably be deemed to affect their judgment or actions in the performance of their duties. Our customers, suppliers and the public at large should know that our employees' judgment is not for sale.  Notwithstanding the foregoing, gifts to healthcare providers such as doctors, nurses and their staff (collectively "HCPs") are not permitted. As part of the healthcare industry, the Company's interactions with HCPs are highly regulated and scrutinized. The Company has adopted separate policies and a healthcare compliance program by which all employees are required to abide. If you have any questions about interactions with HCPs or interpretations of our healthcare compliance program and policies, you should contact the Chief Compliance Officer.

## THE RELEVANT FEDERAL LAWS

45.     The Federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b makes it unlawful to knowingly offer or pay any remuneration in exchange for the referral of any service for which payment is sought from any federally funded healthcare program, such as Medicare or Medicaid.  This law prohibits HCPs from compensating, in cash or in kind, another HCP when the purpose of the payment is to influence that provider's referral habits.  Every federally funded healthcare program requires every provider to ensure compliance with the Anti-Kickback Statute.  As the Company admits in its SEC filings, "a person or entity does not need to have actual knowledge of the statue or specific intent to violate it in order to have committed a violation."

46.     A violation of the Anti-Kickback Statute is punishable by disgorgement of ill-gotten proceeds, civil monetary penalties, and/or exclusion from participation in federal healthcare programs.  Any combination of the above-mentioned penalties would be catastrophic for ACADIA.  The Company relies on Medicare Part D plans for approximately 75% of NUPLAZID's prescriptions.[3]

47.     The Company is also subject to the FCA.  The FCA and similar state provisions proscribe knowingly presenting or causing to be presented to the government any false of fraudulent claim for payment.  "Knowingly" includes making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the government.  "Claim" includes any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.  The government may recover treble damages for a violation of the FCA and

---

[3] The Company does not break out the exact amount of prescriptions that are paid for through Medicare.

civil monetary penalties of up to a maximum of $22,363 for each false claim.

48.     The FCA prohibits: (i) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (ii) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (iii) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government; and (iv) conspiring to violate any of these three sections of the FCA.  31 U.S.C. §§3729(a)(1)(A)-(C) and (G).  Any person who violates the FCA is liable for a civil penalty of up to a maximum of $22,363 for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. §3729(a)(1).  For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. §3729(b)(1).  A violation of the Anti-Kickback Statute is a *per se* violation of the FCA.

49.     The FDA did not approve NUPLAZID until April 2016.

50.

- 19 -



54.

55. ███████████████████████████████████████
██ █████████████████ ███████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████ ACADIA paid Dr. Hermanowicz $180,000 in 2017 (the first full
year NUPLAZID was available for sale) ██████████████████████[4]
ACADIA paid Dr. Kellogg $166,000 in 2017.[5] ██████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

56. ███████████████████████████████ █████████
████████████████████████████████████████████████
██ █████████████████ ███████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████[6]

_____

[4] ProPublica, Dollars for Docs, Neal Hermanowicz, https://projects.propublica.org/docdollars/doctors/pid/136908/year/2017 (last visited Jan. 3, 2020).

[5] ProPublica, Dollars for Docs, Jason Kellogg, https://projects.propublica.org/docdollars/pid/315599/year/2017 (last visited Jan 3, 2020).

[6] "Randomization" is the step in drug trials where patients are randomly assigned to groups that receive different treatments.





60. ████████████████████████████████████████████████

████████████████████████████████████████████████

Dr. Alberto Espay (the Company paid Dr. Espay over $35,000 ████ in 2017)[7] and Dr. Henry Nasrallah (ACADIA paid Dr. Nasrallah over $67,500 in 2017).[8] ████████████████

████████████████████████████████████████████████

61. ████████████████████████████████████████████████

In 2017, ACADIA paid Dr. Kreitzman $155,000.[9] ████████

---

[7]  ProPublica, Dollars for Docs, Alberto Espay, https://projects.propublica.org/docdollars/doctors/pid/318173/year/2017 (last visited Jan. 3, 2020).

[8]  ProPublica, Dollars for Docs, Henry Nasrallah, https://projects.propublica.org/docdollars/doctors/pid/61408/year/2017 (last visited Jan. 3, 2020).

[9]  ProPublica, Dollars for Docs, David Kreitzman, https://projects.propublica.org/docdollars/doctors/pid/337373/year/2017 (last visited Jan 3, 2020).





66. ████████████████████████████████████████████

67.    On April 9, 2018, CNN published an article that questioned the safety of NUPLAZID. ████████████████████████████████████████

68.    ████████████████████████████████████████



69. ▮▮▮▮▮▮▮▮▮▮▮▮

70.     In September 2018, the Company received a civil investigative demand ("CID") from the U.S. Department of Justice ("DOJ") concerning the sales and marketing of NUPLAZID.  The Company disclosed the receipt of this CID in a filing with the SEC in November 2018. ▮▮▮▮▮▮▮▮

---

[10] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[11] ▮▮▮▮▮▮▮▮▮ Dr. Robert Morton.  The Company paid Dr. Morton nearly $61,000 in 2017.  ProPublica, Dollars for Docs, Robert Morton, https://projects.propublica.org/docdollars/doctors/pid/196461/year/2017 (last visited Jan. 3, 2020). ▮▮▮

▮▮ Dr. Idan Sharon.  ACADIA paid Dr. Sharon $131,000 in 2017.  ProPublica, Dollars for Docs, Idan Sharon, https://projects.propublica.org/docdollars/doctors/pid/100410/year/2017 (last visited Jan. 3, 2020).



71.

72.

73.

Accordingly, the Individual Defendants

breached their duty to the Company by approving and allowing these illegal practices.

## THE IMPROPER STATEMENTS

74.     In addition to the above underlying wrongdoing, the Individual Defendants caused or allowed ACADIA to make a series of improper statements about its business since at least 2016.  To start, on May 2, 2016, the Company held a conference call with analysts to discuss the approval and marketing of NUPLAZID.  During the call, defendant Moore discussed the Company's plan to commercialize the drug.  This plan description, however, was misleading, as it misleadingly omitted ███████████████████ ████████████████████████████████████████████████████████  In particular, defendant Moore stated:

> So what I would like to do now over the next few minutes is walk you through some of our commercial thinking regarding the launch and why we are confident NUPLAZID over time should become the standard of care for patients with hallucinations and delusions associated with PDP.
>
> As you know, new products require market education. As with any new medicine, especially one with a novel mechanism of action. And in a disease where there has been no approved therapy we will need to increase awareness and education among the community about the availability and the appropriate use of NUPLAZID.
>
> Among PD patients the frequency of doctor visits varies from monthly to every six months. This likely will impact the opportunity to initiate therapy for potential NUPLAZID patients.
>
> Many physicians may want to see how NUPLAZID works on one or two of their patients to gather first-hand experience with the product. As they get comfortable with NUPLAZID we expect that usage should increase and that the number of patients on drug will likely build over time.
>
> We believe we have a well-designed plan for systematically reaching and detailing the approximately 11,000 key physicians we have identified as PDP treating physicians. In fact, last Monday we onboarded 132 new employees as neuroscience sales specialists who are currently undergoing training. As was the case with the field management team we hired in March of 2015, this truly is an impressive group.

In the process of recruiting and hiring these folks we received over 9,000 applications and conducted 4,300 interviews to find our US-based specialists. Coming out of the gate with a new product it is important to note that our field team experience averages 15 years in the pharmaceutical industry detailing products and their CNS experience on average is eight years.

I can tell you I'm delighted to have such an experienced and seasoned team calling on physicians to educate them on the benefits of NUPLAZID and the impact it can have on patients and their families. They will be well prepared for the launch of NUPLAZID in their territories in June.

With our compelling data NUPLAZID will complement these direct educational efforts with a variety of multi-channel education activities that will help drive awareness of PDP and NUPLAZID. And I am pleased to report that all of our commercial activities are on track and we are now poised for a June launch.

75.     Defendant Moore also discussed the Company's marketing efforts on the call, claiming that ACADIA will have an "extensive sampling program," so that doctors can "see firsthand how the drug works in their hands."  Defendant Moore also failed to mention the ██████████████████████████████  Similarly, defendant Moore did not include the ██████████████████████ ██████████████  in his list of the components to "gross to net adjustments."

76.     The Company held an earnings conference call with analysts on May 5, 2016. Defendant Davis claimed that, "[k]ey priorities for a successful launch will be to educate healthcare providers on NUPLAZID, ensure patient access to NUPLAZID and work with payers to secure reimbursement," without ever disclosing the ████████████ ████████████

77.     Concerning costs to patients of the drug, defendant Moore stated:

For commercially-insured patients, we will provide co-pay assistance. The level of this assistance will vary depending on the patient's coverage and circumstances, but is designed to cover all of their out-of-pocket cost for NUPLAZID. For uninsured patients who meet appropriate financial eligibility criteria, we will provide free drug.

- 30 -

1  Defendant Moore failed to disclose that ███████████████████

2  ███████████████████████████████████████████████████████████

3  ████████████

4      78.    Defendant Moore also reiterated the above statements concerning the

5  Company's marketing efforts.  In response to an analyst's question concerning what the

6  Company's "initial marketing message" will focus on, defendant Moore stated:

> Well, our marketing message revolves around our indication and the benefits
> we provide. And it's up to the physician to decide, but clearly we have
> advantages over existing therapies and there are good reasons for physicians
> to consider switching their patients. So we are going to go out and we are
> going to show the benefits, and we are going to help guide the physician in
> seeing why NUPLAZID would be their best choice.

12     79.    On August 4, 2016, ACADIA issued a press release announcing its financial

13  results for the second quarter ended June 30, 2016.  In the press release, defendant Davis

14  claimed that "we are expanding awareness of NUPLAZID among healthcare professionals

15  through a number of initiatives including speaker programs, media and digital campaigns,

16  and symposia at major medical meetings; and we are working with payors to make

17  NUPLAZID available to eligible patients."

18     80.    Similarly, the Company disclosed in the press release that it had net product

19  sales of $97,000 for the quarter without disclosing that the ████████████████

20  █████████████████████████████████████████  ACADIA repeated this amount in the

21  Company's Quarterly Report on Form 10-Q filed that same day with the SEC.

22     81.    On August 4, 2016, ACADIA held an earnings conference call with analysts

23  to discuss the second quarter results for fiscal year 2016.  On the call, defendant Moore

24  stated: ***"We're executing on a commercialization plan that is focused on broadening***

25  ***awareness of NUPLAZID, ensuring patient access and achieving broad coverage…. It's***

26  ***a matter of getting the right message to the right physician with the right amount of***

27  ***frequency."***

28

82.     During the August 4, 2016 call, defendant Davis repeated that "our key commercial priorities are to broaden awareness of NUPLAZID, to ensure patient access, and work with payers to secure reimbursement."  Defendant Davis also again misleadingly highlighted the speaker program, without disclosing ███████████████ ██████████████████████████████  In particular, he stated: "Along with our commercial team in the field, we are expanding awareness of NUPLAZID through a number of programs and initiatives. Our speaker program and digital and media campaigns for NUPLAZID were initiated at the time of launch and are ongoing."  Defendant Davis also failed to mention ████████████████████████████████

83.     On November 7, 2016, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2016.  In particular, the press release stated:

> "We are very pleased with the launch and are gratified by the positive feedback we have received from physicians, patients, and caregivers on NUPLAZID (pimavanserin)," said Steve Davis, ACADIA's President and Chief Executive Officer. "We saw solid month-over-month prescription growth, reported increased payor coverage, and continued to expand awareness of NUPLAZID among movement disorder specialists, neurologists, and psychiatrists."
>
> *     *     *
>
> ACADIA reported net product sales of $5.3 million for the three months ended September 30, 2016. No similar net product sales were reported for the comparable period of 2015. NUPLAZID was made available for prescription starting May 31, 2016.

84.     The Company filed its Quarterly Report on Form 10-Q for the third quarter with the SEC that same day.  The Form 10-Q reiterated the misleading financial information concerning the net product sales, without disclosing the ████████████ ███████████████████████████████████  The Company also held an earnings conference call with analysts that same day.  During the call, defendant Davis reiterated the net product sales results and stated:

[S]ales specialists have made excellent inroads in broadening and deepening awareness of NUPLAZID, and are getting good access to physicians, including neurologists and psychiatrists. Through our market research and feedback from our sales specialists, we have received strong positive feedback from physicians who have prescribed NUPLAZID, and about their intent to prescribe in the future; importantly, as we have received favorable feedback from physicians about NUPLAZIDconnect, our provider and patient support services center.

*       *       *

We see steady rates of new patients starting, and continuing growth in the number of prescribing physicians and patients on NUPLAZID.

85.    Defendant Moore echoed these sentiments, stating: "Of note, I'm especially pleased to report that we're seeing steady adoption by physicians, with consistent additions of new writers each week through the launch."

86.    While defendant Young detailed the Company's gross to net adjustments, including "patient assistance to eligible, privately insured patients…" he failed to mention that ███████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████

87.    On February 28, 2017, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2016.  In the press release, defendant Davis stated: "[W]e are pleased with the strong progress of the launch and our execution in bringing this drug to Parkinson's patients."  This was incorrect. ████████████████████████████████████████████████ ██████ ██ ███ ██████ █ ██ █ ████ ██ ███ ███████ ████████████████████████ The press release also disclosed that net product sales for the fourth quarter were $12 million, without disclosing that █████████ ██████████████████████████████████████████████

88.    That same day, the Company filed its Annual Report on Form 10-K for the year ending December 31, 2016 with the SEC.  The Form 10-K was signed by defendants

- 33 -

Davis, Young, Biggar, Baker, Brege, Daly, Harrigan, and Soland. The Form 10-K included the net product sales numbers. The Company also acknowledged that that it is subject to the Anti-Kickback Statute relating to its sales and marketing of NUPLAZID. However, ACADIA never disclosed ███████████████████████████████████████ ████████████████████ In particular, the Form 10-K stated:

> *We are subject, directly and indirectly, to federal and state healthcare fraud and abuse laws, false claims laws, physician payment transparency laws and health information privacy and security laws. If we are unable to comply, or have not fully complied, with such laws, we could face substantial penalties.*
>
> \*   \*   \*
>
> *The laws that may affect our ability to operate include:*
>
> - The U.S. federal Anti-Kickback Statute, which prohibits, among other things, persons or entities from knowingly and willfully soliciting, offering, receiving or paying any remuneration (including any kickback, bribe or certain rebates), directly or indirectly, overtly or covertly, in cash or in kind, to induce, or in return for, either the referral of an individual, or the purchase, lease, order or recommendation of any good, facility, item or service, for which payment may be made, in whole or in part, under U.S. federal and state healthcare programs such as Medicare and Medicaid. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation;
>
> - The U.S. federal civil and criminal false claims laws and civil monetary penalties laws, including the civil False Claims Act, which impose criminal and civil penalties, including through civil whistleblower or qui tam actions, on individuals or entities for, among other things, knowingly presenting, or causing to be presented to the U.S. federal government, claims for payment or approval that are false or fraudulent or from knowingly making a false statement to avoid, decrease or conceal an obligation to pay money to the U.S. federal government. In addition, the government may assert that a claim including items and services resulting from a violation of the U.S. federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act.

89.    Substantially similar misleading information is also contained in the Company's Annual Reports on Forms 10-K for fiscal years 2017 and 2018, filed on February 27, 2018 (signed by defendants Davis, Young, Biggar, Baker, Brege, Daly, Harrigan, and Soland) and February 27, 2019 (signed by defendants Davis, Biggar, Baker, Brege, Daly, Harrigan, and Soland), respectively.

90.    On February 28, 2017, the Company held an earnings conference call with analysts that same day.  During the call, defendant Davis stated: "[W]e continue to be extremely pleased with the strong progress at the launch."  However, as stated above, this statement was false.  ███████████████████████████████████████████
████████████████████████████████████████████

91.    Defendant Davis also stated "During the quarter we continued to observe a steadily growing number of patients starting therapy, together with a growing number of prescribers, including repeat subscribers [sic]."  Defendant Davis, however, failed to include ████████████████████████████████████████████████████
████████████████    Defendant Moore also discussed NUPLAZID's "strong" entrance into the market.  In particular, he stated:

> [W]e have had a strong introduction of NUPLAZID into the marketplace, and are pleased by the solid uptake we saw in our second full quarter of commercialization. The use of NUPLAZID increased across all targeted segments, with greater adoption occurring among movement disorder specialists. This was expected, given the high density of PD psychosis patients these physicians treat.

92.    Defendant Young discussed the Company's financial results on the call, including net product sales.  Like the press release, defendant Young failed to disclose the ███████████████████████████████████

93.    On May 9, 2017, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2017.  The press release quoted defendant Davis that, "[t]he use of NUPLAZID® in Parkinson's disease psychosis continues to expand as brand awareness among neurologists, psychiatrists, and other healthcare

providers grows."  The press release also disclosed that net product sales were $15.3 million for the quarter.

94.   That same day, ACADIA filed its Quarterly Report on Form 10-Q for the first quarter of the 2017 fiscal year with the SEC.  The Form 10-Q repeated the net product sales amount and the other financial information in the press release issued that day.

95.   The Company also held an earnings conference call with analysts on May 9, 2017, to discuss its results.  During the call, defendant Davis bragged that "[n]et sales rose to $15.3 million" due to the Company's "solid execution of our growth strategy."  Unsaid, however, was that the Company's growth strategy was ███████████████████ ██████████████████████████████ In particular, defendant Davis stated:

> Our first quarter results reflect continued solid execution of our growth strategy for the NUPLAZID. Net sales rose to $15.3 million.
>
> *     *     *
>
> During the quarter, we continue to see an increase in new prescribers and patients and an increase in the number of repeat prescribers.
>
> *     *     *
>
> [W]e continue to observe strong foundational elements that support NUPLAZID's growth and its potential to grow attractively in the quarters and years to come.

96.   During the call, defendant Yang discussed how certain HCPs were on the Company's "target list" and that "[w]e're actively seeking to influence them, obviously, to use NUPLAZID."  Concerning that influence, defendant Yang stated it was NUPLAZID's "safety and efficacy and the performance of the product thus far" that provided the influence.  This was not true.  In reality, as described above, it was the Company's ███████ ██████████████████████████████

97.   On August 8, 2017, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2017.  In the press release, the Company touted net product sales of $30.5 million.  Defendant Yang reiterated these

financial results in the earnings conference call with analysts that same day.

98.   During the call, defendant Yang also discussed the Company's "significant effort" to work with physicians and increase NUPLAZID prescriptions, without ever acknowledging the ████████████████   In particular, defendant Yang stated:

> We continue to focus significant effort on working with physicians to identify appropriate new patients, and in addition, we have strengthened our commercial effort on caregiver and patient engagement as well as optimizing our approach in the long-term care market segments. I would like to thank our commercial and medical teams for their tireless efforts in educating physicians on the appropriate use of NUPLAZID to benefit patients with PD Psychosis.
>
> *       *       *
>
> I think that we're real pleased with the rate of patient and physician acquisition we're getting. We're still getting new patients every week, every month and moving more of those physicians from trial and dabblers into stronger adopters.

99.   On November 7, 2017, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2016.  The Company reported net product sales of $35.6 million for the quarter compared to $5.3 million for the same quarter the prior year, and $81.3 million in net product sales for the nine months of fiscal 2017 as compared to $5.4 million for the same period in 2016.  ACADIA's Quarterly Report on Form 10-Q for the third quarter filed with the SEC that same day reiterated these results.  Further, defendant Yang reiterated the financial results, including net product sales and expenses, during the earnings conference call with the analysts held that same day.

100.   During the call, defendant Davis stated:

> On the commercial side, we are seeing important progress on multiple fronts. Access to NUPLAZID remains strong. The feedback from physicians, advocacy groups in the Parkinson's community and patients and caregivers continues to be very positive. We continue to make strong progress on our promotional efforts for NUPLAZID with increased brand awareness. We're working hard to increase the awareness of Parkinson's disease psychosis with patients and their caregivers and have important initiatives underway in this

area.

101.   On February 27, 2018, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2017.  The Company reported net product sales of $124.9 million, an increase of $107.6 million, or 622%, from the $17.3 million reported for the year prior year.  Defendant Yang reiterated these positive results during the earnings conference call held with analysts that same day.

102.   During the call, defendant Davis bragged about the growth in NUPLAZID sales, stating:

> In 2017, we saw a robust uptake in NUPLAZID with revenue of $125 million, including $43.6 million in the fourth quarter. And as we look to 2018, we expect net sales to more than double to between $255 million and $270 million. Our 2018 guidance rests on strong volume growth for NUPLAZID, which in turn is based on solid fundamentals in the marketplace. And just to give you a few examples of these fundamentals, they include: Continued growth day after day in the number of patients taking NUPLAZID; growth in the number of physicians prescribing NUPLAZID, including at academic centers, in community practices and in long-term care facilities; greater depth with physicians that is individual physicians prescribing NUPLAZID to a higher number of their patients; market research results that consistently continue to demonstrate very high levels of physician and patient satisfaction with NUPLAZID, including physician intent to prescribe more; and finally, we continue to enjoy very high levels of access.

103.   On May 4, 2018, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2018.  The Company reported net sales of $48.9 million for the first quarter, an increase of 220% as compared to $15.3 million reported for the first quarter of 2017.  The Company filed its Quarterly Report on Form 10-Q with the SEC that same day reiterating the financial results in the press release.  Further, during the earnings conference call held with analyst that same day, defendants Davis and Young reiterated the Company's financial results, including net product sales and expenses.

104.   The above statements were all improper.  While they touted ACADIA's growth and sales, they failed to disclose that the Company's ███████████████████

███████████████████████████████████████████████

## THE TRUTH PARTIALLY LEAKS OUT DESPITE FIDUCIARIES'
## CONTINUED MISLEADING STATEMENTS

105.   On July 9, 2018, SIRF shocked the market when it reported on ACADIA's drug safety concerns and physician kickbacks.  SIRF's report stated, "something is horribly wrong with Acadia's sole drug, Nuplazid."  SIRF wrote that ACADIA "dispens[ed] wads of cash to doctors to incentivize prescription writing and downplay[ed] mounting reports of patient deaths."  SIRF included detailed descriptions of the amounts that the Company was paying doctors based on publicly available information, stating:

> Over the six months that NUPLAZID was commercially available in 2016, ACADIA spent $609,556 on consulting, speaking and travel and lodging payments to 1,578 doctors: Pomona, New York, psychiatrist Dr. Leslie Citrome's $25,690 payout amounted to the largest sum, followed by the $19,142 paid to Dr. Khashayar Dashtipour, a Loma Linda, California based neurologist.

> But what a difference a year makes.

> For 2017, ACADIA paid more than $8.6 million to 7,051 physicians, with 62 doctors receiving more than $50,000 apiece, and 26 receiving at least $100,000 each.

> The leading recipient of ACADIA cash last year was Dr. Neal Hermanowicz, an Irvine, California-based movement disorders specialist who took in $180,123, a handsome improvement over 2016's $10,421. The runner up was psychiatrist Dr. Jason Kellogg, of Santa Ana, California, who was paid $166,259. (In contrast, the $25,690 that Dr. Citrome received in 2016, which was the biggest payout for that year, would have ranked as only the 104th largest payment to doctors if it had been given out in 2017.)

> Given the fact that ACADIA hired a significant number of former Avanir sales staffers, a substantial number of doctors have ended up receiving consulting payments from both Avanir and ACADIA in the same calendar year: A total of 31 did in 2017, as did 29 in 2016. Out of that group, a dozen doctors took in $5,000 apiece or more from the two companies in 2017. Just six did in 2016.

> ACADIA's payments in 2017, according to the Centers for Medicare and Medicaid Services' Open Payments database, were almost entirely for consulting, save $522,935 for food and beverage expenses. (Other payment

categories the centers track include "honorariums," such as fees for lecturing to other medical professionals, or "education," when the company covers the expense of distributing a journal article or staging a presentation at a conference.) Despite ACADIA's discussions about supporting research on NUPLAZID, the company's appetite for external or independent research sharply declined last year. It spent just $197,587 on doctors' research projects, in contrast with its $817,613 outlay in 2016. (Avanir went in the other direction, devoting $7.61 million to research last year and $4.36 million to payments to doctors.)

Since ACADIA doesn't release NUPLAZID's prescription count, Medicare Part D data is the only way to observe prescriber behavior. To that end, overlaying Medicare Part D prescription volume from 2016 (the latest period for which data is available) against the Centers for Medicare and Medicaid Services Open Payments data for 2016 and 2017 illuminates a few things.

There's a good deal of overlap between those who received ACADIA consulting fee payments in 2016 and 2017 and the individuals who prescribed NUPLAZID with some frequency in 2016. For instance, in 2016, 14 of the 25 most frequent prescribers of NUPLAZID to patients covered by Medicaid Part D received "consulting fees" in 2017 worth more than $1.21 million in total.

Almost 37 percent of ACADIA's $1.21 million in consulting fee payments, or $443,014, went to three neurologists who conducted ACADIA -funded studies on NUPLAZID and published journal articles about their findings: Dr. Neal Hermanowicz; Dr. Stuart Hal Isaacson of Boca Raton, Florida; and Dr. Rajesh Pahwa of Kansas City, Kansas.

Pittsburgh-based Dr. Susan Baser, a leading prescriber of NUPLAZID to patients paying for it via Medicaid Part D, told the Southern Investigative Reporting Foundation, "It's the only drug addressing [Parkinson's disease psychosis] and we've had positive effects in some patients." She added, "Personally I think it's a good drug despite the noise about adverse events that's out there."

Baser, who did not receive any consulting fees from ACADIA in 2016 and 2017, expressed surprise at the size of the payments that some of her peers received from the company. "I work 60 hours per week. I don't know how they have the time. I'm just too busy for any of that."

106.   The report further explained that ACADIA is engaging in the same actions that brought about intense regulatory scrutiny on other pharmaceutical companies for violating the FCA, Anti-Kickback, and related statutes.

107.   On this news, the price of ACADIA stock fell from $17.84 per share, the closing price on July 6, 2018, to $16.63 per share at the close of trading on July 9, 2018, a market capitalization drop of more than $151 million, or 6.78%.  Over the entire relevant period, the price of ACADIA stock fell from its high of $41.55 per share, the closing price on June 8, 2016, to $15.07 per share at the close of trading on June 28, 2018, a loss of $26.48 per share, or 63.73%.  This resulted in a net market capitalization drop of more than $2.8 billion or nearly 60%.

108.   The Company is now the subject of a securities fraud class action pending in the U.S. District Court for the Southern District of California.  In addition, on November 28, 2018, the Company disclosed in a filing with the SEC that it received the CID from the DOJ concerning the sales and marketing of NUPLAZID.

**THE INDIVIDUAL DEFENDANTS NEGLIGENTLY MADE MISLEADING STATEMENTS IN THE COMPANY'S PROXY STATEMENTS**

109.   Plaintiff's allegations with respect to the misleading statements in the Company's proxy statements are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

110.   On April 27, 2017, the Company filed its Proxy Statement on Form DEF 14A for its 2017 Annual Meeting of Stockholders with the SEC (the "2017 Proxy").  The 2017 Proxy sought: (i) the election of defendants Daly and Harrigan; and (ii) the approval of an amendment to the Company's 2010 Equity Incentive Plan to increase the aggregate number of shares of common stock.

111.   The 2017 Proxy misleadingly presented the oversight exercised by the Board. The 2017 Proxy specifically points to the Code on page 17.  The 2017 Proxy includes a link to the website to reach the complete wording of the Code.  The contents of the Code, however, are false and thus so is the 2017 Proxy.  In particular, the Code states, "[t]he compliance environment within each supervisor's assigned areas of responsibility will be a significant factor in evaluating the quality of that individual's performance."  The Code also states:

> Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities…. Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties.

The Code also states:

> Violations of this Code will not be tolerated. Any employee who violates the standards in this Code may be subject to disciplinary action, which, depending on the nature of the violation and the history of the employee, may range from a warning or reprimand up to and including termination of employment and, in appropriate cases, civil legal action or referral for regulatory or criminal prosecution.

112.   This was not the case.  ███████████████████████
████████████████████████████████████████████████████████
███████████████████████████    ███████████████████████████
███████████████████████████████████████

113.   The 2017 Proxy also claimed that the Board was actively involved in the risk oversight of the Company and taking appropriate steps to discourage risk taking, particularly with compensation.  In particular, the 2017 Proxy states on pages 11-12:

**ROLE OF THE BOARD IN RISK OVERSIGHT**

One of the Board's functions is risk oversight for the Company. The Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as

through various Board standing committees that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company. Our Compensation Committee is responsible for overseeing the Company's executive compensation plans and arrangements and assessing whether any of our compensation policies or procedures has the potential to encourage excessive risk-taking. The Audit Committee oversees management of financial risks. The Audit Committee also monitors compliance with legal and regulatory requirements related to our finances. The NCG Committee manages risks associated with corporate governance, including the independence of the Board and potential conflicts of interest. Typically, the applicable Board committees discuss the applicable risk oversight at least annually at one of the regularly scheduled meetings for that committee with the relevant employees. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board of Directors is regularly informed through committee reports and reports from management about such risks.

114.   Regarding the Board's "compensation philosophy," the 2017 Proxy states that, its "Compensation Committee has discussed the concept of risk as it relates to the forms and amounts of compensation at ACADIA and does not believe that our compensation arrangements encourage excessive or inappropriate risk taking." The 2017 Proxy claimed that the Board linked the compensation to the Company's long-term success. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Accordingly, the members of the Compensation Committee, and indeed the whole Board, knew that the Company's compensation was encouraging violations of the FCA and Anti-Kickback Statute, an obviously excessive risk.

115.   The Board compounded these negligently made, material misstatements in its discussion of Proposal 2, the amendment to the 2010 Equity Incentive Plan to increase the number of shares available to be issued for stock-based awards by 5.5 million shares. The Board claimed that the amendment "is an integral part of our long-term compensation philosophy and **the Amended 2010 Plan is necessary to continue providing the**

*appropriate levels and types of equity compensation for our employees*."

116.   The 2017 Proxy discusses the criteria for the performance goals under the Amended 2010 Plan in the following manner:

> Performance goals under the Amended 2010 Plan shall be determined by a committee of the Board composed solely of outside directors members, based on any one or more of the following performance criteria: (i) the attainment of certain target levels of, or a specified percentage increase in, revenues, earnings, income before taxes and extraordinary items, net income, operating income, earnings before income tax, earnings before interest, taxes, depreciation and amortization or a combination of any or all of the foregoing; (ii) the attainment of certain target levels of, or a percentage increase in, after-tax or pre-tax profits including, without limitation, that attributable to continuing and/or other operations; (iii) the attainment of certain target levels of, or a specified increase in, operational cash flow; (iv) the achievement of a certain level of, reduction of, or other specified objectives with regard to limiting the level of increase in, all or a portion of, the Company's bank debt or other long-term or short-term public or private debt or other similar financial obligations of the Company, which may be calculated net of such cash balances and/or other offsets and adjustments as may be established by the Committee; (v) earnings per share or the attainment of a specified percentage increase in earnings per share or earnings per share from continuing operations; (vi) the attainment of certain target levels of, or a specified increase in return on capital employed or return on invested capital; (vii) the attainment of certain target levels of, or a percentage increase in, after-tax or pre-tax return on stockholders' equity; (viii) the attainment of certain target levels of, or a specified increase in, economic value added targets based on a cash flow return on investment formula; (ix) the attainment of certain target levels in, or specified increases in, the fair market value of the shares of the Company's common stock; (x) the growth in the value of an investment in the Company's common stock; (xi) the attainment of a certain level of, reduction of, or other specified objectives with regard to limiting the level in or increase in, all or a portion of controllable expenses or costs or other expenses or costs; (xii) gross or net sales, revenue and growth of sales revenue (either before or after cost of goods, selling and general administrative expenses, research and development expenses and any other expenses or interest); (xiii) total stockholder return; (xiv) return on assets or net assets; (xv) return on sales; (xvi) operating profit or net operating profit; (xvii) operating margin; (xviii) gross or net profit margin; (xix) cost reductions or savings; (xx) productivity; (xxi) operating efficiency; (xxii) working capital; or (xxiii) market share; (xxiv) customer satisfaction;

(xxv) workforce diversity; (xxvi) results of clinical trials; (xxvii) acceptance of a new drug application by a regulatory body; (xxviii) regulatory body approval for commercialization of a product; (xxix) regulatory body approval of additional indications or improved labeling for an already-approved product; (xxx) launch of a new drug; (xxxi) completion of out-licensing, in-licensing or disposition of product candidates or other acquisition or disposition projects; (xxxii) successful completion of a financing; (xxxiii) maintenance and enhancement of investor base; and (xxxiv) to the extent that an Award is not intended to comply with Section 162(m) of the Code, other measures of performance selected by our Board. These performance criteria can be calculated under generally accepted accounting principles ("GAAP") or can be calculated using non-GAAP results as predetermined when establishing the performance goals.

117.    The 2017 Proxy put forward that the criteria the Board was using to compensate employees would align with the interests of the Company's long-term stockholders while appropriately managing risk.  The truth was, however, that the Board's compensation plan, as amended, encouraged excessive risk taking and the violations of the law, which in turn damaged the Company as described herein.

118.    The Board's misstatements and omissions in the 2017 Proxy were material to the Company's stockholders in their decision whether to reelect defendants Daly and Harrigan and whether to approve the amendment to the 2010 Equity Incentive Plan.  The proxy solicitation process in connection with the 2017 Proxy was an essential link in the approval of the election of the directors and the approval of the amendment.  The 2017 Proxy harmed the Company by allowing and encouraging the continuation of the ███ ████████████████████████  and providing ACADIA's employees with excessive compensation.

119.    On April 30, 2018, the Company filed its Proxy Statement on Form DEF 14A for its 2018 Annual Meeting of Stockholders with the SEC (the "2018 Proxy").  The 2018 Proxy, among other matters, sought: (i) the reelection of defendants Baker, Biggar, and Soland; and (ii) the approval of another amendment to the 2010 Equity Incentive Plan, this time for an increase of 6.7 million shares.  On April 30, 2019, the Company filed its Proxy Statement on Form DEF 14A for its 2019 Annual Meeting of Stockholder with the SEC

(the "2019 Proxy").  The 2019 Proxy sought: (i) the reelection of defendants Brege and Davis; (ii) the approval of another amendment to the 2010 Equity Incentive Plan for, among other things, an increase of an additional 8.3 million shares; and (iii) the approval of an amendment to the Company's 2004 Employee Stock Purchase Plan.

120.   Like the 2017 Proxy, the 2018 and 2019 Proxies misleadingly presented the oversight of the Company by the Board and the (mis)alignment of the Company's employees with its stockholders.  The 2018 and 2019 Proxies again pointed stockholders to the Code and contained the same language concerning the role of the Board in risk oversight, which was false for the reasons stated above.  Similarly, the 2018 and 2019 Proxies misleadingly claimed that the Company's compensation practices did not encourage excessive or unnecessary risk taking.  In particular, the 2018 Proxy stated:

**Compensation Risk Assessment**

We believe that although a portion of the compensation provided to our executive officers and other employees is performance-based, our executive compensation program does not encourage excessive or unnecessary risk taking. This is primarily due to the fact that our compensation programs are designed to encourage our executive officers and other employees to remain focused on both short-term and long-term strategic goals within the context of our pay-for-performance compensation philosophy. As a result, we do not believe that our compensation programs encourage excessive or inappropriate risk taking.

121.   The 2019 Proxy stated:

**Compensation Risk Assessment**

Although a portion of the compensation provided to our executive officers and other employees is performance-based, the executive compensation program does not encourage excessive or unnecessary risk taking. This is primarily due to the fact that the compensation programs are designed to encourage executive officers and other employees to remain focused on both short-term and long-term strategic goals within the context of a pay-for-performance compensation philosophy.

122.   The 2018 and 2019 Proxies also included the Board's performance goals criteria that largely mirrors the 2017 Proxy and misleadingly presented the Board's "compensation philosophy" as one that provided employees long-term incentives that aligned with stockholders without encouraging excessive risk taking.

123.   The 2018 and 2019 Proxies were false and misleading for the same reasons as the 2017 Proxy.  The proxy solicitation process in connection with the 2018 and 2019 Proxies were an essential link in the approval of the election of the directors and the approval of the amendment, which in turn harmed the Company by continuing the ███ ██████████████████████ and provided employees with unwarranted compensation.

## DAMAGES TO ACADIA

124.   As a result of the Individual Defendants' improprieties, ACADIA disseminated improper, public statements regarding the Company's sales and compliance with applicable law.  These improper statements have devastated ACADIA's credibility as reflected by the Company's over $2.8 billion, or nearly 60%, market capitalization loss.

125.   ACADIA's ability to raise equity capital or debt on favorable terms in the future is now impaired, despite such capital raises vital to the Company as a drug development company that is still losing money.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

126.   Further, as a direct and proximate result of the Individual Defendants' actions, ACADIA has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)   costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)   costs incurred from responding to the CID and eventually resolving the DOJ investigation;

- 47 -

(c)     costs of the materially misleading 2017-2019 Proxies, including the repercussions of the approval of the amendments to the compensation plans based on the materially misleading information; and

(d)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to ACADIA.

## EQUITABLE RELIEF IS NECESSARY TO PREVENT CONTINUING LEGAL VIOLATIONS

127.   In addition to any monetary damages the Company is entitled to, plaintiff requests equitable relief from the Court.  In particular, ███████████████ ████████████████████████████████████████████████████████ ██████████████████   The Board has signed off on this approach, despite knowing that the DOJ is investigating ACADIA's marketing practices.  In addition, as explained above, the Company's compensation practices encourage excessive risk taking, ███████████ ████████████████████████████████

128.   Accordingly, plaintiff seeks an injunction from further implementation of the ████████████████████████████████ and a new proxy that is not misleading concerning the election for all directors, regardless of when the director would be up for election on the Board's current staggered election regime.  Further, plaintiff seeks an order that the approval of the amendments to the 2010 Equity Incentive Plan were done viewing a materially misleading proxies, and an injunction on the issuance of any further stock-based awards until the issuance of a new proxy statement that is no longer materially misleading and a compensation plan is set in place that does not encourage the violations of the law detailed herein.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

129.   Plaintiff brings this action derivatively in the right and for the benefit of ACADIA to redress injuries suffered, and to be suffered, by ACADIA as a direct result of violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.

ACADIA is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

130.   Plaintiff will adequately and fairly represent the interests of ACADIA in enforcing and prosecuting its rights.

131.   Plaintiff was a stockholder of ACADIA at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current ACADIA stockholder.

132.   The current Board of ACADIA consists of the following seven individuals: defendants Biggar, Baker, Brege, Daly, Davis, Harrigan, and Soland.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

133.   Defendants Biggar, Baker, Brege, Daly, Davis, Harrigan, and Soland's challenged misconduct at the heart of this case constitutes a threat to the Company's very survival.  As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread improper activities.  Causing the Company to engage in the illegal tactics that threaten its survival is not a protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

**Demand Is Excused Because Defendants Biggar, Baker, Brege, Daly, Davis, Harrigan, and Soland Face a Substantial Likelihood of Liability for Their Misconduct**

134.   Defendants Biggar, Baker, Brege, Daly, Davis, Harrigan, and Soland breached their duties of care and loyalty by approving and failing to stop the Company's

[12]

---

[12] Because plaintiff seeks equitable relief, the Company's exculpatory provision is irrelevant for demand futility purposes.

135.   As alleged above, defendants Biggar, Baker, Brege, Daly, Davis, Harrigan, and Soland breached their fiduciary duties of loyalty making improper statements in the Company's press releases and public filings and therefore face a substantial likelihood of liability.

136.   Defendants Biggar, Baker, Brege, Daly, Davis, Harrigan, and Soland negligently made materially misleading statements in the 2017-2019 Proxies, as detailed above.

137.   Defendants Brege, Daly, and Soland, as members of the Audit Committee, reviewed and approved the improper statements.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and ethical compliance.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants Brege, Daly, and Soland face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Demand Is Excused Because of the Board's Lack of Independence**

138.   Baker Brothers Advisors LP and its affiliated funds ("Baker Bros.") is a hedge fund focused on investing in public life sciences companies.  Baker Bros. was founded by defendant Baker and his brother, Felix Baker ("Felix"), in 2000.  In addition to Baker Bros., the Bakers have managed investment funds for the Tisch family (the founders of Loews Corporation; the "Baker-Tisch funds") since 1994 as part of an investment partnership.  Defendant Biggar is also an employee of Baker Bros.  Baker Bros. owns nearly 28% of the Company.

139.   Defendant Baker and his brother Felix select from a consistent stable of individuals to represent Baker Bros. in its investments.  Defendants Davis, Stankovic, Daly,

Biggar, Soland, and Harrigan are all members of this stable from which defendant Baker and Felix have selected.

140.   In particular, defendant Davis was an officer of Neurogen Corporation ("Neurogen") from 1994 until its acquisition in 2009, culminating in Davis serving as CEO from February 2008 to December 2009.   Defendant Stankovic was also an officer of Neurogen, reaching Executive Vice President and Chief Development Officer from April 2008 to May 2009.   Defendant Harrigan was Neurogen's Executive Vice President and Chief Development Officer from May 2002 to March 2003.   The Baker-Tisch funds were invested in Neurogen since 1999, and still were invested at the time of Neurogen's acquisition.   Defendant Baker served as a director of Neurogen from 1999 to 2009.   By the time defendant Stankovic left Neurogen in 2009, it had less than 20 employees.

141.   Defendant Davis was the Executive Vice President and Chief Operating Officer of Ardea Biosciences, Inc. ("Ardea"), a biotechnology company focused on the development of small-molecule therapeutics for the treatment of serious diseases, from April 2010 until, at least June 2012.   In June 2012, Ardea was acquired by Zeneca Inc. Baker Bros. and the Baker-Tisch funds were invested in Ardea as early as June 2003, until the time of Ardea's acquisition.   Felix was a director of Ardea at the same time defendant Davis was its officer.

142.   After Ardea, defendant Davis became the Execute Vice President and Chief Operating Officer of Heron Therapeutics, Inc. ("Heron"), another biopharmaceutical company, and another company that Baker Bros. (and the Baker-Tisch funds) heavily invested in.   Defendant Davis also served as a director of Heron from June 2012 to June 2015 and October 2019 to the present.

143.   Baker Bros. has had a significant investment in Bellicum Pharmaceuticals, Inc. ("Bellicum") since at least January 2015 (5.8% of that company).   Defendants Davis and Daly have been directors of Bellicum since May 2016, and defendant Harrigan served as a director of Bellicum from February 2018 to December 2019.

144.   Baker Bros. and the Baker-Tisch funds were invested in Trimeris, Inc. ("Trimeris") starting in March 2000, at the latest.  Defendants Davis and Baker served as directors of Trimeris from June 2007 to November 2011.

145.   In November 2011, Trimeris merged with Synageva BioPharma Corp., ("Synageva") with Synageva as the surviving company.  Synageva, prior to the merger, was a private company of which defendant Biggar and Felix served as directors.  After this merger, defendants Davis and Biggar and Felix all served on Synageva's board of directors until June 2015, when Synageva was acquired by Alexion Pharmaceutical, Inc.

146.   Defendant Biggar served as a director of BioCryst Pharmaceuticals, Inc. ("BioCryst") from October 2005 through October 2011.  Baker Bros. and the Baker-Tisch funds owned almost 14% of BioCryst.

147.   Baker Bros. and the Baker-Tisch funds own approximately 15% of Incyte Corporation ("Incyte"), and have been invested in Incyte since 2001.  Defendant Baker has served as a director of Incyte since 2001.  Defendant Daly served as the Executive Vice President and Chief Commercial Officer of Incyte from October 2012 to June 2015. Defendant Harrigan has served as a director of Incyte since December 2019.

148.   Baker Bros. was a major investor in DBV Technologies S.A. ("DBV") since at least February 2015, and owned over 15% of the company as of December 31, 2018. Defendant Soland has served as a director of DBV since March 2015.

149.   Defendant Soland was also the Vice President, Chief Commercial Officer, and Chief Operating Officer of Viropharma Incorporated ("Viropharma") until it was acquired in January 2014.  Baker Bros. and the Baker-Tisch funds had been invested in Viropharma since at least February 2005.

150.   Due to these long-standing ties, defendants Baker, Davis, Daly, Biggar, Soland, and Harrigan will not vote to initiate litigation against each other.

151.   Plaintiff has not made any demand on the other stockholders of ACADIA to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     ACADIA is a publicly held company with over 154 million shares outstanding and thousands of stockholders as of October 23, 2019;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## PLAINTIFF'S CLAIMS ARE TIMELY

152.   Plaintiff was diligent about her rights as a stockholder.  Plaintiff sent her inspection demand to the Company on May 23, 2019, less than six months after the partial truth came out.  Plaintiff received a response to her demand on June 14, 2019, claiming that her demand was improper.

153.   Nevertheless, plaintiff and ACADIA negotiated a confidentiality agreement (executed on July 21, 2019) and a scope of production of documents.  Plaintiff received the first of a rolling document production on July 31, 2019.

154.   After ACADIA claimed its production was complete, on October 16, 2019, plaintiff wrote to the Company about deficiencies in its production.  In response, on November 12, 2019, ACADIA provided additional documents in response to plaintiff's inspection demand.

155.   Plaintiff now brings this action less than two months after ACADIA completed its production.  The documents ACADIA provided in response to plaintiff's inspection demand were necessary and essential for her to plead her claims, including the securities claim.  In fact, some of the key wrongdoing, most notably the ███████████ ███████, still is not public.

156.   Therefore, plaintiff's claims are timely.

# COUNT I

**Against the Director Defendants for Violation of Section 14(a) of the Exchange Act**

157.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.   The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

159.   The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2017-2019 Proxies.  In the 2017-2019 Proxies, the Board solicited stockholder votes to reelect directors and approve amendments to the 2010 Equity Incentive Plan.

160.   The 2017-2019 Proxies, however, misrepresented and failed to disclose: (i) the Board's oversight of the Company and the incentives in ACADIA's compensation practices to encourage violations of the law.  By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, ACADIA misled and deceived its stockholders by making misleading statements that were essential links in stockholders heeding to the Company's recommendation to reelect the directors and approve the amendments.

161.   The misleading information contained in the 2017-2019 Proxies was material to ACADIA's stockholders.

162.   Plaintiff, on behalf of ACADIA, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2017-2019 Proxies and the equitable relief described herein.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

163.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

164.   The Individual Defendants owed and owe ACADIA fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe ACADIA the highest obligation of good faith, fair dealing, loyalty, and due care.

165.   The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within ACADIA, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

166.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ACADIA has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

167.   Plaintiff, on behalf of ACADIA, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

168.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

169.   As a result of the Individual Defendants' wrongdoing, including by failing to conduct proper supervision, they have caused ACADIA to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty or were excessive in light of the materially misleading 2017-2019 Proxies.

170.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

171.   Plaintiff, on behalf of ACADIA, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

172.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

173.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of ACADIA.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to ACADIA and made possible pursuant the approval of the amendments to the 2010 Equity Incentive Plan made possible by the materially misleading 2017-2019 Proxies.

174.   Plaintiff, as a stockholder and representative of ACADIA, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

175.   Plaintiff, on behalf of ACADIA, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of ACADIA, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment;

B.     Directing ACADIA to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ACADIA and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls concerning compliance with the FCA and Anti-Kickback Statute;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a provision to permit the stockholders of ACADIA to nominate at least three candidates for election to the Board; and

4.      a proposal to strengthen ACADIA's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of ACADIA has an effective remedy;

D.      Awarding to ACADIA restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants,

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: February 7, 2020            ROBBINS LLP
                                      BRIAN J. ROBBINS
                                      GEORGE C. AGUILAR
                                      CRAIG W. SMITH
                                      STEVEN R. WEDEKING

                                      _/s/*Brian J. Robbins*_
                                      BRIAN J. ROBBINS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
gaguilar@robbinsllp.com
csmith@robbinsllp.com
swedeking@robbinsllp.com

Attorneys for Plaintiff

## <u>VERIFICATION</u>

I, Tiffany Barney, hereby declare as follows:

I am a stockholder of ACADIA Pharmaceuticals Inc. and have been a stockholder continuously since November 2012.  I have retained competent counsel and am ready, willing, and able to pursue this action vigorously on behalf of ACADIA Pharmaceuticals Inc.  I have reviewed the verified stockholder derivative complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 01/08/2020

TIFFANY BARNEY